**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

**BRUCE R.,**

          **Plaintiff,**

  v.                                     **Civil Action 1:22-cv-582
Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

          **Defendant.**

**OPINION AND ORDER**

Plaintiff, Bruce R. brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 10) and **AFFIRMS** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff protectively filed his application for DIB on February 13, 2019, asserting disability beginning July 25, 2017, due to complex regional pain syndrome (CRPS) and depression caused by CRPS. (R. at 212–16, 230). After his application was denied initially in September 2019, and on reconsideration in April 2020, the Administrative Law Judge (the "ALJ") held an online video hearing on August 25, 2021, before issuing a decision denying Plaintiff's applications on September 29, 2021. (R. at 17–36).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on October 9, 2022 (Doc. 1), and the Commissioner filed the administrative record on December 8, 2022. (Doc. 7). The matter has been briefed and is ripe for consideration. (Docs. 10, 13, 14).

    **A.  Relevant Hearing Testimony**

The ALJ summarized Plaintiff's testimony from the administrative hearing:

> [Plaintiff] testified that he lives with his wife, and that he is an attorney. He was general counsel for a large company. He was on call 24/7. He stopped work in 2017. He testified that he had had an aortic repair in 1992, and that the valves were replaced. He did cardiac rehab, which is when he began having pain. He noticed his foot becoming heavy. It got to the point that he could not wear shoes or socks. He was originally diagnosed with reflex sympathetic dystrophy (RSD). He testified that he is sensitive to heat/cold. His left foot is more sensitive than his right. He testified that he cannot walk for long. He can drive for short distances, but his wife does most of the driving. He is moving into a ranch house due to his physical impairments.
>
> He takes several medications. They relieve some of his symptoms, but do not eliminate them. They make him sleepy as a side effect. He testified that it is difficult for him to focus, and that he has brain fog.
>
> He testified that he wakes up between 7:30-8:00 A.M., and that he feels much better in the morning than in the afternoon. His left foot and his pain cause difficulty concentrating. He testified he tried a spinal cord stimulator, but it did not help. He does yoga. He used to run and ride bikes, but he does not do so currently due to his health. His mother died in 2020, and he was able to see her only because his wife drove. He testified that Dr. Brummer stated he had depression. He has an excellent work record (Exhibit 3D).

(R. at 26).

**B. Relevant Medical Evidence**

The ALJ summarized the relevant medical records as to Plaintiff's severe impairments as follows:

> The record shows [Plaintiff] complained of left foot numbness/pain that started after a mitral valve replacement in July 2017, and which has been progressive (Exhibit 1F, page 15). For instance, he complained of left foot pain in November 2017 (Exhibit 3F, pages 6-10). His left ankle had a full range of motion and normal muscle strength. His left foot had no obvious deformity, swelling, or ecchymosis. It was tender to palpitation over the 2nd and 3rd metatarsal heads. Range of motion and strength was normal, and his gait was normal with no limp. A left ankle X-ray was negative. The diagnosis was metatarsalgia of the left foot. An X-ray of the left foot performed in early 2018 showed a stress fracture of the metatarsal bone (Exhibit 3D, page 20). He was using a boot for the stress fracture.
>
> In March 2018, [Plaintiff] was alert and oriented (Exhibit 1F, page 7). His mood and affect were appropriate. He had a bluish discoloration at the ends of the toes

2

of the left foot. There was some numbness in the left foot, but sensation was normal otherwise. There was tenderness in the left toes, but nothing severely acute. His problems were considered likely to be vascular in nature (Exhibit 1F, page 8).

In June 2018, it was noted that he had hypersensitivity of the distal toes and metatarsal region (Exhibit 1F, page 13). There was some flushing, which appeared to be small vessel disease. It was also noted that month that memory and mentation were grossly intact, and that he was alert and oriented (Exhibit 1F, page 17). Muscle strength was 5/5 throughout (Exhibit 1F, pages 18-19). His sensation was intact, his reflexes were 2 throughout, finger-nose coordination was normal, rapid alternating movements were fluid, and his gait was steady.

A lumbar MRI showed only mild multilevel degenerative changes, but there was no definite evidence of neural impingement (Exhibit 3F, pages 50-51). An EMG of the bilateral lower extremities suggested an acute on chronic left lumbar radiculopathy and right lumbar radiculopathy (Exhibit 4F, pages 11-12). Nerve conduction abnormalities in bilateral sural sensory nerves and right medial plantar mixed nerve was most likely physiologic in nature, and not pathologic. There was no evidence of bilateral lumbosacral plexopathy, peripheral neuropathy, tarsal tunnel syndrome, or myopathy in the nerves/muscles tested.

At an examination in August 2018, he reported his pain was only 3/10 (Exhibit 3F, page 54). On examination, he was alert and oriented, his gait was normal, his cranial nerves were intact, and his mood, memory, affect, and judgment were normal (Exhibit 3F, page 57). The same findings were present in November 2018 (Exhibit 3F, pages 71 and 75-76). It was noted in September 2018 that [Plaintiff] had no side effects from his medication (Exhibit 4F, page 22).

An electrocardiogram performed in January 2019 showed an ejection fraction of 40-45% (Exhibit 2F, pages 9-10). His respiratory and musculoskeletal examinations were normal, and he had a normal mood and affect.

In February 2019, [Plaintiff] still had pain in his left foot, but it was about 50-75% better and he reported his pain was only 3-4/10 (Exhibit 3F, pages 80-85). He also reported he was using shoes and socks more. On examination, he was still alert and oriented, his gait was still normal, and his mood, memory, affect, and judgment were normal.

In May 2019, [Plaintiff] continued to state that his left foot pain was 50-75% better (Exhibit 4F, pages 56-63). He had some lumbar tenderness. His gait was normal. His mood, memory, affect, and judgment were normal. Cranial nerves were intact. He rated his pain at 4/10 (Exhibit 10F, page 12). His medications were tolerable.

In August 2019, [Plaintiff] stated that his pain had stabilized, it was about 50% better, it was rated 3-5/10, and he had no side effects from his medications (Exhibit 10F, page 38). On examination, he continued to have a normal gait, and his mood,

3

memory, affect, and judgment remained normal (Exhibit 10F, page 42).

Consultative examiner Stephen Billmann, Psy.D., examined [Plaintiff] in September 2019 at the request of the Administration (Exhibit 5F). [Plaintiff] had no mental health history, except that he was taking Duloxetine, which was prescribed for pain. It made him feel more hopeful. [Plaintiff] stated that he visited friends locally. He watched Netflix movies and did daily exercise. He could drive adequately. He and his wife handled their household funds. He took out the trash, cleaned dishes, and helped with laundry. He had no difficulty maintaining relationships with friends and relatives.

[Plaintiff]'s mood was euthymic. His affect was appropriate. His scores on a cognitive test were normal. He had an excellent working memory and a mild deficit in short-term memory.

His judgment appeared to be sufficient for him to make decisions affecting his future. He had insight into his current difficulties. His diagnosis was an adjustment disorder with depressed mood.

[Plaintiff] underwent a pain psychological evaluation in October 2019 to determine the appropriateness for a spinal cord stimulator (Exhibit 6F). It was noted that [Plaintiff] had maintained a relatively high level of functional activity as evidenced by his involvement in a daily fitness program at local facilities, and he was teaching himself how to play the guitar. Any current emotional distress did not appear to be severe. He was found to be an appropriate candidate for a spinal cord stimulator. At another examination in October 2019, [Plaintiff] rated his pain at only 3-4/10 (Exhibit 10F, page 62).

[Plaintiff] reported in November 2019 that his spinal stimulator was working well, he seemed to be doing better overall, and his pain remained relatively low at 3-5/10 (Exhibit 10F, page 87).

He still had pain in his left foot, but it was 50-75% better. His gait was normal, as were his mood, memory, affect, and judgment (Exhibit 10F, page 92).

[Plaintiff] stated in January 2020 that his stimulator was doing well, and that he was about 40% better (Exhibit 10F, page 111). He rated his pain at only 3-4/10. He reported he was using shoes, and that ice had been effective for his foot pain. Again, his examination was mostly normal with normal gait, mood, memory, affect, and judgment (Exhibit 10F, pages 115-116). His medications were tolerable (Exhibit 10F, page 121).

In March 2020, [Plaintiff] was doing better with medication changes (Exhibit 10F, page 142). He was doing well, and with medication, he was 50% more functional. His pain had been stabilized. Topamax had been ceased due to mental fogging. His pain was still only 3-4/10. His gait was still normal (Exhibit 10F, page 147).

4

> His mood, memory, affect, and judgment were still normal (Exhibit 10F, page 152).
>
> In December 2020, after the date last insured of June 30, 2020, [Plaintiff] rated his pain at only 3/10 with medication (Exhibit 12F, pages 3-4). Strength was 5/5 in the lower extremities, straight leg raises were negative bilaterally, and he could walk without assistance.
>
> In January 2021, it was noted that [Plaintiff] had developed complex regional pain syndrome following a mitral valve replacement in 2017 (Exhibit 11F). Since that time, he had been managed by various oral medications, and he had undergone several interventional procedures to address his left foot pain syndromes without significant or prolonged relief, including left L4-5 epidural steroid injections, four lumbar sympathetic blocks, a sciatic peripheral nerve stimulator, and a spinal cord stimulator trial. [Plaintiff] wanted to consider Ketamine infusion therapy vs. a dorsal root ganglion stimulator trial. At another examination that month, he rated his pain at only 3/10 (Exhibit 12F, page 9).
>
> It was noted in February 2021 that [Plaintiff] had no cardiac issues (Exhibit 15F, page 2). In March 2021, [Plaintiff] rated his pain at only 2/10 (Exhibit 12F, pages 13-14). He had had a DRG trial in February 2021, he had been able to increase his activities, and he had had more than 50-70% pain relief.

(R. at 27–29).

### C. The ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirement through June 30, 2020, and did not engage in substantial gainful employment during the period from his alleged onset date of July 22, 2017 through his date last insured of June 30, 2020. (R. at 22). The ALJ determined that, through his date last insured, Plaintiff had the following severe impairments: degenerative disc disease, hyperlipidemia, diseases of the aortic valve, chronic ischemic heart disease, osteoarthritis, and complex regional pain syndrome (CRPS). (*Id.*). Still, the ALJ found that, through his date last insured, none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (R. at 24).

As to Plaintiff's residual functional capacity ("RFC"), through the date last insured, the ALJ concluded:

> [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can stand/walk 4 hours per day, sit about 6 hours per day, can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds. He can frequently balance (as defined by the SCO). He must avoid all exposure to dangerous hazards.

(R. at 25).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of his symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 26).

Relying on the vocational expert's testimony, the ALJ found that Plaintiff was capable of performing his past relevant work as a lawyer. (R. at 31). He therefore concluded that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from July 25, 2017, the alleged onset date, through June 30, 2020, the date last insured (20 CFR 404.1520(f))." (R. at 32).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007)

6

(citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

In his Statement of Errors, Plaintiff first alleges that the ALJ improperly evaluated the state agency reviewers' assessments. (Doc. 10 at 2–3). Plaintiff also alleges that the ALJ erred in his RFC determination by not considering the effect of Plaintiff's mood disorder on his ability to work under SSR[1] 96-8. (*Id.* at 3). Next, Plaintiff argues that the ALJ did not comply with SSR 03-2p in evaluating the severity of his RSD/CRPS condition. (*Id.* at 4). Plaintiff further contends the ALJ erred in evaluating Plaintiff's subjective report of symptoms, specifically by ignoring the medical evidence documenting Plaintiff's persistent efforts to obtain pain relief for his symptoms as addressed in SSR 16-3p and by concluding that Plaintiff's activities of daily living are compatible with competitive work. (*Id.* at 5–6). Finally, Plaintiff argues that the ALJ erred when he summarily concluded that Plaintiff could return to his past relevant work. (*Id.* at 6–7). The Undersigned considers each argument in turn.

### A. RFC Determination and Evaluation of Medical Source Opinions

Because Plaintiff filed his application after March 27, 2017, it is governed by the relatively new regulations describing how evidence is categorized, considered, and articulated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c (2017). A plaintiff's RFC is an assessment

---

[1] "Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 n.1 (6th Cir. 2010) (quoting 20 C.F.R. § 402.35(b)(1)).

of "the most [a plaintiff] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). A plaintiff's RFC assessment must be based on all the relevant evidence in his case file. *Id*. The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[2] 20 C.F.R. § 404.1513(a)(1)–(5). Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [Plaintiff]'s medical sources." 20 C.F.R. § 404.1520c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." § 404.1520c(c)(1)–(5).

Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered. 20 C.F.R. § 416.920c(b)(2). When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 416.920c(c)(1). When evaluating consistency, the more consistent

---

[2] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 404.1513(a)(2), (5).

8

a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 416.920c(c)(2). An ALJ may discuss how he or she evaluated the other factors but is generally not required to do so. 20 C.F.R. § 416.920c(b)(2).

Thus, the role of the ALJ is to articulate how she considered medical opinions and how persuasive she found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021). The role of the Court is not to reweigh the evidence, but to make sure the ALJ employed the proper legal standard by considering the factors and supported the conclusion with substantial evidence. *Id.* at *14.

When discussing the prior administrative finding offered by Sreenivas Venkatachala, M.D. and Dana Schultz, M.D., the ALJ determined:

> The physical assessments of the state agency reviewers are persuasive because they are generally consistent with and supported by the record (Exhibit 1A and 3A). The consultants are medical experts familiar with Administration rules/regulations, and they provided a fairly detailed analysis of the record when formulating their opinions. Subsequent records are similar/not materially different. In fact, as detailed above, the longitudinal record indicates [Plaintiff] was mostly normal on examination, including often having normal gait and normal strength, he was fairly active, including attending meetings and exercising regularly, he reported his medications help, he reported fairly low pain levels, and he had mostly intact activities of daily living.

(R. at 30).

Plaintiff says that the ALJ erred in finding these medical opinions supported because the state agency physicians never examined him. (Doc. 10 at 2). Plaintiff's assignment of error also focuses on the consistency factor, arguing "none of the agency consultants . . . had the opportunity to review any of the medical records which were submitted to the file after the dates of their respective medical reviews on August 19, 2019, and April 20, 2020 . . . ." (*Id.*).

"At the outset, the Court notes the inherent lack of clear delineation between supportability and consistency when an ALJ evaluates the opinion of a reviewer, like a state agency physician, who forms her opinion after a holistic review of the medical evidence of record." *Elaine S. v. Comm'r of Soc. Sec.*, No. 3:22-CV-240, 2023 WL 2623575, at *4 (S.D. Ohio Mar. 24, 2023). In other words, a state agency physician bases her medical opinion on the medical evidence of record only, not a physical examination of a plaintiff. And, in evaluating such an opinion, an ALJ is tasked only with fulfilling the "purpose of the regulation: to give a fulsome review to medical opinions and prior administrative findings, paying particular attention both to how the opinions are internally supported and explained, and how they compare to the record as a whole." *Id.* To find state agency physician medical opinions *per se* unsupported because the physicians do not conduct physical examinations of the person claiming disability would render the standard practice of having these reviewing physicians *review* the medical evidence meaningless.

Here, the ALJ sufficiently explained the supportability and consistency findings for the state agency physicians' medical opinions. While the ALJ's evaluation of the state agency physicians' opinions was brief, he adequately addressed the supporting evidence elsewhere in his decision. And he is not required to repeat his analysis. *See Carlene C. v. Comm'r of Soc. Sec. Admin.*, No. 3:20-CV-245, 2022 WL 278168, at *5 (S.D. Ohio Jan. 31, 2022); *see Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (noting that the ALJ's entire decision must be considered). As to Plaintiff's argument that the state agency physicians' opinions were inconsistent because they did not review more recent medical records (Doc. 10 at 2), the ALJ consulted these subsequent medical records in his evaluation of the state agency physicians' opinions. (*See* R. at 30 ("Subsequent records are similar/not materially different. In fact, as detailed above, the longitudinal record indicates the [Plaintiff] was mostly normal on examination,

10

including often having normal gait and normal strength, he was fairly active, including attending meetings and exercising regularly, he reported his medications help, he reported fairly low pain levels, and he had mostly intact activities of daily living.")). That the ALJ meaningfully reviewed the medical evidence of record, including more recent evidence, is the crux of the Court's analysis—not that the state agency physicians failed to review medical evidence not in their possession.

Looking earlier in the decision, the ALJ cites records that post-date the from after the state agency physicians' review. Particularly, the ALJ summarized:

> In December 2020, after the date last insured of June 30, 2020, the [Plaintiff] rated his pain at only 3/10 with medication (Exhibit 12F, pages 3-4). Strength was 5/5 in the lower extremities, straight leg raises were negative bilaterally, and he could walk without assistance. In January 2021, it was noted that the [Plaintiff] had developed complex regional pain syndrome following a mitral valve replacement in 2017 (Exhibit 11F). Since that time, he had been managed by various oral medications, and he had undergone several interventional procedures to address his left foot pain syndromes without significant or prolonged relief, including left L4-5 epidural steroid injections, four lumbar sympathetic blocks, a sciatic peripheral nerve stimulator, and a spinal cord stimulator trial. The [Plaintiff] wanted to consider Ketamine infusion therapy vs. a dorsal root ganglion stimulator trial. At another examination that month, he rated his pain at only 3/10 (Exhibit 12F, page 9). It was noted in February 2021 that the [Plaintiff] had no cardiac issues (Exhibit 15F, page 2). In March 2021, the [Plaintiff] rated his pain at only 2/10 (Exhibit 12F, pages 13-14). He had had a DRG trial in February 2021, he had been able to increase his activities, and he had had more than 50-70% pain relief.

(R. at 29). Reading the ALJ's entire treatment of the state agency physicians' findings, it is clear that consideration was given to both the supportability and consistency of the findings.

Still more, while the ALJ's discussion of the state agency physicians' findings was admittedly brief, this is perhaps in part because he adopted their opined limitations in full. (*See* R. at 25, 88–89). Put simply, he did not need to distinguish the state agency physicians' conclusions about Plaintiff's residual functional capacity from his own—which were elsewhere supported in detail and by substantial evidence. (R. at 25–31). All told, the ALJ assessed the supportability

11

and consistency of the state agency physicians' findings. And his conclusion that the findings were persuasive, as well as his ultimate RFC determination, were supported by substantial evidence. Regarding the state agency physicians, Plaintiff's assignment of error is without merit.

Next, in evaluating the prior administrative findings from Kathleen O'Brien, Ph.D. and Paul Tangeman, Ph.D., as to Plaintiff's mental health impairments, the ALJ determined:

> The state agency mental assessments are persuasive because they are also consistent with the medical evidence, which does not support the presence of "severe" mental impairments. It is noted that there is a clerical error in their assessments. They mistakenly identify a depressive disorder as being "severe", but the "B" criteria indicate it is non-severe, and elsewhere in the assessment they indicate mental is not severe. The non-severe mental assessment is consistent with the record, which often noted [Plaintiff]'s mood, affect, and/or behavior was normal (Exhibits 4F, pages17, 26, 34, 41, 51, 61, 10F, pages16, 25, 42, 52, 66, 76, 92, 101, 116, 120, 126, 131, 147, 152, 158, 163, for example). Moreover, Consultative examiner Stephen Billmann, Psy.D., noted [Plaintiff] was essentially normal on examination (Exhibit 5F).

(R. at 30). Plaintiff says the ALJ erred in finding the state agency psychologists' opinions persuasive, "especially since the ALJ specifically noted in his decision that the consultative reviewers mistakenly identified a depressive disorder as being 'severe[,]' but the 'B' criteria indicated it is non-severe, and elsewhere in their assessments they indicate the mental impairment is not severe." (Doc. 10 at 2–3).

This is not grounds for remand. The ALJ noted the state agency psychologists' clerical error and confirmed that the assessment of Plaintiff's mental impairments as non-severe was supported by the state agency psychologists' own evaluations and the record as a whole. (R. at 30 (citing 443, 452, 460, 467, 477, 487, 492-97, 522, 531, 551, 561, 575, 585, 601, 610, 625, 629, 635, 640, 656, 661, 667, 672)). The Court cannot find any other evidence in the record to support a finding of depressive disorder as a severe impairment. And Plaintiff offers no such evidence

12

either. As such, the ALJ did not err in finding the state agency psychologists' opinions persuasive despite them making this clerical error.

Plaintiff also argues that the ALJ failed to consider properly his non-severe impairments in the RFC determination. (Doc. 10 at 3). More specifically, Plaintiff says that the ALJ erred by not considering the effect of his mood disorder in crafting the RFC. (*Id.*). The Court disagrees. While the ALJ did not adopt any limitations to the RFC based on Plaintiff's mental impairments, he did evaluate all symptoms and impairments in the RFC determination. (R. at 25–31). He summarized that Plaintiff:

> has no problems with his personal cares, he provides some care for a cat, he does not need reminders to take medicine or to take care of personal needs and grooming, . . . is able to pay bills and count change, he is able to handle a savings account and use a checkbook, he reads, he gets together with friends, he talks on the phone, he attends local political party monthly meetings, he is learning to play guitar.

(R. at 27 (citing 37–67, 426–500). And, when he was examined by a consultive psychology examiner, Plaintiff's "mood was euthymic. His affect was appropriate. His scores on a cognitive test were normal. He had an excellent working memory and a mild deficit in short-term memory. His judgment appeared to be sufficient for him to make decisions affecting his future. He had insight into his current difficulties." (R. at 28 (citing 492–97)). So, given this evidence, the ALJ did not include any limitations to the RFC based on Plaintiff's mental health assessment. Notably, Plaintiff does not offer what mental health limitations should have been included in the RFC. (*See* Doc. 10 at 3). Plaintiff "bears the burden to show that an impairment invokes work-related limitations." *Hicks v. Berryhill*, No. 3:17-CV-176-HBG, 2018 WL 2074181, at *4 (E.D. Tenn. May 3, 2018) (citing *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003)). Plaintiff has failed to satisfy his burden, and the Court finds this assignment of error without merit.

### B. The ALJ's Review of Plaintiff's Symptom Severity

13

Next, Plaintiff says that the ALJ "did not comply with SSR 03-2p in evaluating the severity of his RSD condition." (Doc. 10 at 4). Plaintiff also alleges that the ALJ erred in evaluating Plaintiff's subjective report of symptoms, especially by ignoring the medical evidence documenting Plaintiff's persistent efforts to obtain pain relief for his symptoms as addressed in SSR 16-3p and by concluding that Plaintiff's activities of daily living are compatible with competitive work. (*Id.* at 5–6).

First, despite Plaintiff's assertions (*see* Doc. 10 at 4), the Social Security Administration has not set forth a different standard for evaluating claims involving Reflex Sympathetic Dystrophy Syndrome (RSD) and Complex Regional Pain Syndrome (CRPS). Instead, "'[c]laims in which the individual alleges RSDS/CRPS are adjudicated using the sequential process, just as for any other impairment.'" *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 439 (6th Cir. 2017) (citing SSR 03-2p). Here, the ALJ's RSD severity determination comports with the sequential evaluation process for RSD claims. The ALJ found Plaintiff's RSD/CRPS to be a severe impairment (R. at 22), but determined it did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404. (*Id.* at 24–25). The ALJ specifically considered the criteria for Listings 1.15 (Disorders of the skeletal spine resulting in compromise of a nerve root(s)) and 1.18 (Abnormality of a major joint(s) in any extremity) but found that Plaintiff lacked any muscle weakness, troubles with ambulating (requiring an assistive device), inability to use upper extremities, nerve compression, or decreased sensation as required by those listings. (*Id.*).

Then, the ALJ extensively considered Plaintiff's symptoms of RSD/CRPS in fashioning the RFC. In fact, all of the limitations to the RFC seem to be an effort to accommodate Plaintiff's RSD/CRPS. (R. at 25 (Plaintiff has the "residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: he can stand/walk 4 hours per day, sit about 6 hours per

day, can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds. He can frequently balance (as defined by the SCO). He must avoid all exposure to dangerous hazards.")). The ALJ set forth these limitations after examining the objective medical evidence (R. at 27–31) and Plaintiff's subjective reports of pain (R. at 26–27).

> When discussing Plaintiff's subjective complaints, the ALJ determined:
>
> [Plaintiff] claims that he is disabled due to his impairments and related symptoms. The medical record indicates [Plaintiff] suffers from degenerative disc disease, hyperlipidemia, diseases of the aortic valve, chronic ischemic heart disease, osteoarthritis, and complex regional pain syndrome (CRPS); and that these are severe impairment because they cause limitations or restrictions having more than a minimal effect on [Plaintiff]'s ability to do basic work-related activities. However, the objective evidence is inconsistent with [Plaintiff]'s subjective allegations, and his impairments do not limit him beyond the residual functional capacity outlined above. In fact, the medical record reflects mostly benign findings, and that [Plaintiff] was mostly normal on examination, including often having normal gait and normal strength, he was fairly active, including attending meetings and exercising regularly, he reported his medications help, he reported fairly low pain levels, and he had mostly intact activities of daily living.
>
> The record indicates [Plaintiff] has no problems with his personal cares, he provides some care for a cat, he does not need reminders to take medicine or to take care of personal needs and grooming, he performs some household chores such as light housework, laundry, he walks, he drive, he shops in stores and by computer, he is able to pay bills and count change, he is able to handle a savings account and use a checkbook, he reads, he gets together with friends, he talks on the phone, he attends local political party monthly meetings, he is learning to play guitar, he exercises, he watches television, and he drives, all of which indicates [Plaintiff] had mostly intact activities of daily living (4E, 5F, 6F, and testimony). In fact, [Plaintiff] described a wide variety of activities of daily living compatible with competitive work. For example, he is able to do some housework, some driving, reading, attending meetings, shopping and social activities.

(R. at 26–27).

But Plaintiff says that the ALJ should have considered his "persistent efforts to obtain pain relief for his symptoms . . . ." (Doc. 10 at 5). When a Plaintiff alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating those symptoms. *See* 20 C.F.R. §

15

404.1529; SSR 16-3p, 2016 WL 1119029, *3 (March 16, 2016).[3]  First, the ALJ must determine whether the individual has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; second, the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  *See also* 20 C.F.R. § 404.1529(c)(3).

In performing this assessment, the ALJ is not required to analyze all seven factors but must still show that he considered the relevant evidence.  *Roach v. Comm'r Soc. Sec.*, No. 1:20-cv-01853-JDG, 2021 WL 4553128, at *10–11 (N.D. Ohio Oct. 5, 2021).  Indeed, the ALJ's assessment of an individual's subjective complaints and limitations must be supported by substantial evidence and be based on a consideration of the entire record.  *Rogers*, 486 F.3d at 247 (internal quotation omitted).  Nonetheless, it remains the province of the ALJ—not the reviewing court—to assess the consistency of subjective complaints about the impact of a plaintiff's symptoms with the rest of the record.  *See id.*  Therefore, "absent a compelling reason," an ALJ's credibility/consistency determination will not be disturbed.  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

---

[3] Soc. Sec. R. (SSR) 16-3p, 2016 WL 1119029, which "provides guidance about how [the SSA] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms," superseded SSR 96-7p and became applicable to decisions issued on or after March 28, 2016.  *See* SSR 16-3p, 2017 WL 5180304 (October 25, 2017) (clarifying applicable date of SSR 16-3p).

Here, the ALJ clearly considered the relevant evidence. He looked to Plaintiff's daily activities, which include exercise and housework. (R. at 27). The ALJ noted that Plaintiff's treatment plan helped alleviate his symptoms of RSD/CRPS and stabilize his pain to a relatively low level. (*Id.* at 27–29). In support for his claim that the ALJ erred in evaluating the severity of his pain, Plaintiff says that the ALJ ignored evidence of Plaintiff receiving ketamine infusion therapy, physical therapy, gabapentin, duloxetine, Lyrica, Topamax, a BSX Spinal Cord Stimulator, a Sprint Peripheral Stimulator, sympathetic nerve root block injections, and selective nerve root block injections. (Doc. 10 at 5–6 (citing R. at 674–75 (medical opinion from January 13, 2021), 678–82 (medical record from December 22, 2020), 684–87 (medical record from January 5, 2021), 688–90 (medical record from March 4, 2021), 694–702 (medical records from April 5, 2021 to April 16, 2021), 707–09 (medical record from December 14, 2020). But the Court notes that these treatments occurred after the expiration of Plaintiff's insured status. (R. at 22 (date last insured of June 30, 2020)).

Plaintiff has not alleged that these treatments show a worsening of his condition. In fact, these records show that Plaintiff's pain was lessening over time. (R. at 699 (April 9, 2021 treatment record: Plaintiff "believes that infusions have finally started helping [with] pain."); R. at 697 (April 12, 2021 treatment record: Plaintiff is "brighter, more talkative today[,] [and] even energetic! [Plaintiff is] [e]xcited [and] hopeful about the pain relief he's been experiencing."). And despite Plaintiff's contention, the ALJ did consider evidence after the Plaintiff's last insured date in his RFC determination. He summarized:

> In December 2020, after the date last insured of June 30, 2020, the claimant rated his pain at only 3/10 with medication (Exhibit 12F, pages 3-4). Strength was 5/5 in the lower extremities, straight leg raises were negative bilaterally, and he could walk without assistance. In January 2021, it was noted that the claimant had developed complex regional pain syndrome following a mitral valve replacement in 2017 (Exhibit 11F). Since that time, he had been managed by various oral

17

> medications, and he had undergone several interventional procedures to address his left foot pain syndromes without significant or prolonged relief, including left L4-5 epidural steroid injections, four lumbar sympathetic blocks, a sciatic peripheral nerve stimulator, and a spinal cord stimulator trial. The claimant wanted to consider Ketamine infusion therapy vs. a dorsal root ganglion stimulator trial. At another examination that month, he rated his pain at only 3/10 (Exhibit 12F, page 9). It was noted in February 2021 that the claimant had no cardiac issues (Exhibit 15F, page 2). In March 2021, the claimant rated his pain at only 2/10 (Exhibit 12F, pages 13-14). He had had a DRG trial in February 2021, he had been able to increase his activities, and he had had more than 50-70% pain relief.

(R. at 29). At bottom, Plaintiff has not established a "compelling reason" why the ALJ's credibility/consistency determination as to Plaintiff's reports of pain should be disturbed, *Halter*, 307 F.3d at 379, or minimally pointed to a material piece of evidence not considered by the ALJ. Ultimately, the Court finds Plaintiff's argument without merit.

The Court will address briefly Plaintiff's concerns with the ALJ's consideration of Plaintiff's daily activities. Plaintiff says that "performing household chores, laundry, occasionally shop and drive, use a computer, pay bills, count change, handle a savings account, use a checkbook, read, watch TV, play a guitar, and occasionally attend a meeting is vastly different from working eight hours a day in a labor-intensive job" and the "ALJ should not penalize the [Plaintiff] for attempting to lead a normal life in spite of his severe impairments." (Doc. 10 at 6). As stated in the above analysis, an ALJ must evaluate the intensity, persistence, and functional limitations of reported symptoms by considering objective medical evidence and other evidence—including daily activities—when a Plaintiff asserts symptoms of disabling severity. *See* 20 C.F.R. § 404.1529(c)(3). It is not error for an ALJ to make inferences about a plaintiff's ability to work from his daily activities in addition to other subjective and objective evidence.

**C. Plaintiff's Ability to Perform His Past Relevant Work**

Lastly, Plaintiff says the ALJ erred when he "summarily concluded that [Plaintiff] could return to his past relevant work[] as a lawyer." (Doc. 10 at 6). Specifically, Plaintiff says that SSR

18

82-62 "requires that sufficient documentation be obtained to support the decision. Adequate documentation of past work includes information about those work demands which have a bearing on the medically established limitations. Detailed information about strength, endurance, manipulative ability, mental demands, and other job requirements must be obtained as appropriate." (*Id.* at 6–7). But "the [Plaintiff] bears the burden of proving ... the fact that [he] is precluded from performing [his] past relevant work." *Jones*, 336 F.3d at 474.

In determining whether a plaintiff can perform his past relevant work, Defendant "will ask [a plaintiff] for information about work [they] have done in the past," and it "may use the services of vocational experts or vocational specialists ... to obtain evidence" to determine whether a plaintiff "can do [their] past relevant work, given [their] residual functional capacity." 20 C.F.R. § 404.1560(b)(2). As this provision makes clear, an ALJ does not err by relying on a vocational expert ("VE") to develop the record regarding a plaintiff's past relevant work experience. The ALJ did exactly that in this case in addition to utilizing Plaintiff's testimony as to the demands of the work he has done in the past. (R. at 31–32, 44–47, 62–63). Because Plaintiff makes no argument that the VE's testimony regarding Plaintiff's past relevant work was itself insufficient, there is no basis for a finding of error.

**IV.  CONCLUSION**

Based on the foregoing, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 10) and **AFFIRMS** the Commissioner's decision.

IT IS SO ORDERED.

Date:  July 7, 2023                                                  /s/ Kimberly A. Jolson
                                                                     KIMBERLY A. JOLSON
                                                                     UNITED STATES MAGISTRATE JUDGE